UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 AUG 11  AM 9: 36

CLERK

BY _____
DEPUTY CLERK

2:21-cv-192

BARRY PAULSON, KIM PAULSON
(on behalf of BARRY PAULSON), and
MICHELLE SULLIVAN (on behalf of
BARRY PAULSON),

        Plaintiffs,

        v.

BARBARA THOMAS and
MICHAEL THOMAS,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

VERIFIED COMPLAINT
AND JURY DEMAND

## INTRODUCTION

1.     This complaint tells the sad—and all too common—story of an elderly individual who was financially exploited by someone who was supposed to be serving as his caretaker. The Plaintiff, Barry Paulson, is an elderly man who lived in Perkinsville, Vermont during the events in this case. He is currently 82 years old and cared for by his daughter and daughter-in-law in Odessa, Florida. Over the past 5 years, his health and mental faculties have substantially declined. For approximately the last two years, he has suffered from dementia and been legally blind. He was declared mentally incapacitated in March 2021.

2.     The Defendants, Barbara and Michael Thomas, took advantage of Mr. Paulson's declining health to steal more than $90,000 of his life savings. After convincing Mr. Paulson to make Ms. Thomas a co-owner of his bank account—evidently under the pretext that she would be added to help him manage his own finances—the Thomases spent his money on themselves. The day after she was added to the account, Ms. Thomas withdrew a staggering $30,000 from the account in a single transaction. Upon information and belief, she used that money to buy a property which she now co-owns with her husband. Over the course of the next year, the

Thomases made thousands of dollars of additional purchases at Walmart, gas stations, and Home Depot, among other places, and set up automatic debits to pay their own utilities and credit card bills. Ms. Thomas also routinely withdrew $500 of cash from ATMs, totaling more than $25,000. She brazenly made a number of these purchases and withdrawals when Mr. Paulson was in the hospital, undergoing treatment for conditions associated with his mental and physical decline.

3.     When asked by Mr. Paulson's daughter-in-law, Ms. Sullivan, why she was on the bank account, Ms. Thomas did not deny it, but claimed that she was put on the account "to help Barry pay his bills." This explanation is strongly contradicted by the evidence, which shows that the Thomases spent many tens of thousands of dollars of Mr. Paulson's money on their own needs.

4.     Mr. Paulson, and his daughter and daughter-in-law, seek justice and to recover the money that was wrongfully stolen from him.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiffs Barry Paulson, Kim Paulson, and Michelle Sullivan are residents of the state of Florida. Kim Paulson is the daughter of Barry Paulson. Michelle Sullivan is her wife.

6.     Defendants Barbara and Michael Thomas are residents of the state of Vermont.

7.     This Court has personal jurisdiction over Barbara and Michael Thomas because they are residents of the state of Vermont.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there exists complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000.

9.     Venue is proper under 28 U.S.C. § 1391(b)(1) because the Defendants reside in this judicial district and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claim occurred within the jurisdiction of the United States District Court for the District of Vermont.

## FACTS

### *Mr. Paulson's Life And Medical History*

10.     Barry Paulson is an 82-year old man currently cared for by his daughter, Kim Paulson, and daughter-in-law, Michelle Sullivan, in Odessa, Florida. Mr. Paulson was born in 1938 in Portland, Maine. He has always been a hard worker and committed to providing for his family. After serving two years in the Marine reserves during high school in Tampa, Florida, Mr. Paulson married his high school sweetheart, then enlisted in the Air Force where he served as a flight line mechanic in Tacoma, Washington. The Air Force ultimately brought him back to Tampa, where he was honorably discharged. He worked as an architectural draftsman while completing his college degree at the University of Tampa. After graduating, he taught industrial arts to high schoolers to support his young family while he also built their first home and learned to fly. He ultimately moved to Nantucket, Massachusetts, where he spent most his adult life working as a commercial pilot. After retiring from his job as a pilot, he started a tile and contracting business, which he owned and operated for several years. About 5 years ago, Mr. Paulson moved to Perkinsville, Vermont, where he built a log cabin on 5 acres.

11.     For the last several years, Mr. Paulson's mental and physical health has been deteriorating. In or around 2019, his family and close friends, including Ms. Paulson and Ms. Sullivan, began to observe that his mental faculties were declining, and that he was becoming increasingly unable to manage his affairs. For example, Mr. Paulson would routinely

tell them that he was unable to check his blood sugar or to administer his own medications, such as insulin. He also was quick to become frustrated and prone to anger and long-winded complaints, which was uncharacteristic of his personality. He had difficulty explaining problems or issues he was struggling with, and even more difficulty understanding potential solutions. He would often "just go along" with whatever was suggested, even though he clearly did not understand the import of the suggestion. He would regularly talk in a loop, repeating statements or questions that he had already asked, or ignoring questions that were asked of him. In one of his journal entries from May 2020, he writes that he "lost a day, thought it was Saturday." He also complained to his daughter, Ms. Paulson, in November 2020 that he was unable to write checks to pay his bills, or even sometimes find his checkbook. Unsurprisingly, Ms. Sullivan and Ms. Paulson also discovered some of Mr. Paulson's bills from as early as September 2019 that were more than 6 months overdue. From these observations, it became clear to Ms. Paulson and Ms. Sullivan that, at least as early as 2019, Mr. Paulson was unable to manage his finances, his home life, or his own health care.

12.     In addition to his mental impairments, Mr. Paulson also suffers from near total blindness. He became legally blind in or about early 2019. His vision began to deteriorate more than 10 years ago, and for at least the last two years he has not been able to see anything but large shapes and shadows. He cannot read anything typewritten on paper and everything must be read to him or magnified extremely using specialized electronic devices. For at least 5 years, he has been unable to operate a vehicle due to blindness and other conditions. Ms. Paulson and Ms. Sullivan have observed his inability to read documents. Additionally, Mr. Paulson has struggled for several years with his hygiene, regularly failing to keep his body and hair clean.

4

13.     Mr. Paulson's medical records also reflect his declining mental and physical

faculties over the last several years and track the observations of Ms. Paulson and Ms. Sullivan.

A record from a March 7, 2019 visit notes that Mr. Paulson finds it "very difficult" to handle his

finances, read his mail, identify medicine, and prepare meals.  A doctor's note from a February

13, 2020 visit reflects that Mr. Paulson "feels he has memory problems." On April 3, 2020, a

doctor wrote: "I do worry that there is a cognitive impairment as well which may be making

things worse." Another note from a November 24, 2020 visit reports: "Mr. Paulson continues to

make a poor adjustment to his aging and health status. . . . [Mr. Paulson] complained and vented

his frustrations and anger at limitations he is experiencing with: balance, vision, hearing,

memory and concentration." A note from one week later states that Mr. Paulson feels "his

memory is failing him."

14.     After several years of mental and physical decline, on January 8, 2021, Mr.

Paulson was admitted to the Veterans Affairs hospital in White River Junction, Vermont ("VA"),

after he was found at his home on the ground after a fall.  Mr. Paulson reported to providers that

he fell down when he tried to get out of his chair at 4 a.m. and that he may have hit his head on

the stove.  Mr. Paulson was discharged a week later.  Records relating to his stay indicate that

Mr. Paulson suffered from significant visual impairments and hearing loss, among other things.

The records further indicate that Mr. Paulson had neighbors who "help him with groceries and

other miscellaneous tasks."  This hospital stay lasted about one week.

15.     On February 18, 2021, Mr. Paulson was again admitted to the VA, after he was

discovered naked on the floor of his home.  Responding Emergency Medical Service personnel

reported that he had not been taking his medications.  Among other things, the records from the

hospitalization indicate that Mr. Paulson was legally blind, received palliative care, and

experienced confusion and agitation. After two weeks of inpatient treatment at the VA, on

March 4, 2021, Dr. Anne Felde, a staff psychiatrist, declared Mr. Paulson incapacitated. The

associated documentation notes that Mr. Paulson was not able to: 1) communicate and sustain a

choice; 2) understand relevant information; 3) appreciate his situation and its consequences,

namely the information about his condition and its significance; and 4) manipulate information

rationally and logically come to a decision. As it related to his treatment, a nurse practitioner's

note deemed him unable to understand his medical problems, the proposed treatment or

alternatives, or the foreseeable consequences of his decisions about his own medical care.

Dr. Felde's notes also indicate that Mr. Paulson's vascular dementia was a permanent condition

that would not permit him to regain capacity. Ms. Paulson and Ms. Sullivan were thus given

control over Mr. Paulson's medical care.

16.     Ms. Paulson and Ms. Sullivan both received Durable Power of Attorney (DPOA)

over Mr. Paulson's affairs on April 1, 2021. They moved him to Florida to live with them

following his discharge from the VA on March 17, 2021. He resided with them until July 19,

2021, when he was moved into an adult care facility near their home. They continue to see him

weekly, manage his finances, and are engaged closely with his medical team.

### Ms. Thomas Exploited Mr. Paulson's Vulnerabilities To Become An Owner Of His Bank Account

17.     Several years ago, Mr. Paulson and Ms. Thomas became acquainted. She was his

neighbor in Weathersfield, Vermont. Because of Mr. Paulson's memory loss, and the lack of

other known witnesses to their introduction, it is unknown exactly how or when they became

acquainted. However, it is clear that, sometime in 2018, Ms. Thomas began using a sugar shack

on Mr. Paulson's property to run a farm stand, called the Ascutney Farm Stand. In or around

that time, Ms. Thomas also began helping Mr. Paulson pay his bills. Because of his eyesight

6

issues, she would write checks for him to sign and help him organize his bills.  Mr. Paulson

described Ms. Thomas's role during this time as his "bookkeeper."  This description is also

corroborated by contemporaneous notes in his medical records.  For example, a note from a

doctor's visit on October 8, 2020 states: "Who manages patient's finances?  Veteran states that

he has a woman who rents the farm stand on the property to help him with writing checks and

paying bills (as part of a barter for rent)."  And a doctor's note from Mr. Paulson's January 2021

hospitalization states that his finances were "handled by 'Paramedic' friend who rents property."

As explained below, Ms. Thomas has also described herself to others as Mr. Paulson's

bookkeeper and stated that she helped him pay his bills.  Ms. Thomas had access to Mr.

Paulson's checkbook and his account/routing numbers at this time.

      18.     In January 2020, Ms. Thomas was added as an owner of Mr. Paulson's bank

account at Claremont Savings Bank.  As an owner on the account, Ms. Thomas was granted full

access to the account and was issued a debit/ATM card that she could use to complete purchases

and withdraw money.  She was also designated as having a right of survivorship over the assets

in the account and signed up to receive electronic statements for the account to her email

address.

      19.     Given Mr. Paulson's declining memory, Plaintiffs do not presently know all of the

circumstances surrounding the addition of Ms. Thomas to his bank account.  Mr. Paulson has

stated that he did not ever take a trip to the bank (or anywhere else) with Ms. Thomas, and he

does not recall ever adding her to his account.  Mr. Paulson has stated that he would never have

added her to his account or authorized her to be added to his account under any circumstances.

Given Mr. Paulson's infirmities, he would have needed to be driven to the bank and, due to his

blindness, every word of any paperwork given to him at the bank would have needed to be read

to him out loud and thoroughly explained to him. Upon information and belief, Ms. Thomas either forged Mr. Paulson's signature on the bank documents authorizing her addition as an owner, or used her influence over Mr. Paulson and exploited his vulnerabilities to coerce or trick him into signing the forms which he did not understand. To the extent that Mr. Paulson did sign the documentation, Mr. Paulson clearly did not understand the import of his signature or the fact that he was authorizing Ms. Thomas to become an owner of his account with a right of survivorship. The bank has advised Ms. Sullivan that it did not check identification when the relevant documentation was completed. Mr. Paulson has never authorized Ms. Thomas to use the money in his account to pay her own expenses and bills or those of her husband, let alone have a right of survivorship over his savings. Over the years, he has told third parties that she helped him pay *his own* bills.

20.    Ms. Thomas's recent statements confirm that she was not authorized to use Mr. Paulson's money for her own purposes. In a conversation with Ms. Paulson's sister, Kelly Gifford, on or about February 23, 2021, Ms. Thomas described herself as Mr. Paulson's bookkeeper. In a conversation with Ms. Sullivan in March 2021, Ms. Thomas told Ms. Sullivan that she was on the account to help Mr. Paulson with his bills. At this time, Ms. Sullivan was filling out an application in connection with Mr. Paulson's Medicaid benefits, and she needed copies of the bank statements and records of Mr. Paulson's finances to complete the application. Ms. Sullivan asked Ms. Thomas if she knew how to access Mr. Paulson's bank statements. Ms. Thomas stated that she could provide those statements because she was on Mr. Paulson's account. When Ms. Sullivan asked *why* she was on the account, Ms. Thomas reported that Mr. Paulson "added her to his account to help him with his bills." Over the next several days, Ms. Sullivan repeatedly asked Ms. Thomas for copies of the bank statements and any bookkeeping

8

ledgers of his expenses, which she needed in order to fill out the Medicaid forms. Ms. Thomas

was increasingly evasive and refused to provide them, citing uncredible reasons. (For example,

at one point, she said that her printer had run out of ink, even though that same day she had

printed a copy of another long document for Ms. Sullivan.)

21.     Eventually, Ms. Thomas provided Ms. Sullivan with a single document listing the

bills that she was supposedly helping Mr. Paulson to pay over the course of a year. She never

provided Ms. Sullivan with any bank statements. As discussed more below, Ms. Thomas's

reluctance to provide the bank statements makes perfect sense in light of the fact that it is clear

from reviewing those statements that she had been stealing money from Mr. Paulson for more

than a year.

22.     The list of expenses Ms. Thomas provided is below:

| Barry's Exspenses | | | | | |
|---|---|---|---|---|---|
| Direct TV | Monthly | $115.00 | $1,380.00 year | | |
| Decamp Trucking | Monthly | $45.00 | $540.00 year | | |
| US Cellular | Monthly | $116.00 | $1,392.00 year | | |
| GMP | Monthly | $280.00 | $3,660.00 year | | |
| MD Electric | Varies | | $250.00 year | Generator Service | |
| Darring Spaulding | Varies | | $400.00 year | Plowing & Sanding | |
| Town of Weathersfield | Quarterly | $407.00 | $1,625.00 year | Includes Homestead Act | $4,323.00 |
| Farm Family | Monthly | $100.00 | $1,200.00 year | Home and Auto | |
| VT Dept of Human Service | Monthly | $20.00 | $240.00 year | Auto Withdrawl | |
| HB Energy | Varies | $250.00 | $3,000.00 year | | |
| Hughnet | Monthly | $125.00 | $1,500.00 year | Auto Withdrawl | |
| Groceries | Weekly | $175.00 | $9,100.00 year | | |
| Cigars | Weekly | $67.00 | $3,464.00 year | | |
| Orkin | Varies | | $200.00 year | | |
| | | $1,700.00 | $27,971.00 | SS Check Coming 1500.00 | |

This was the only paperwork that Ms. Thomas produced regarding the alleged "bookkeeping"

that she did for Mr. Paulson. She produced none of the documentation that any bookkeeper—

even an unsophisticated one—would be expected to keep, even after Ms. Sullivan specifically

requested it. The only other paperwork she provided to Ms. Sullivan were two ATM slips,

showing the account balances in March 2021, and one receipt for $300 from the individual

responsible for snowplowing and sanding Mr. Paulson's driveway. As explained in detail below,
Ms. Thomas withdrew far more money from Mr. Paulson's account than would have been
necessary to cover the expenses listed in the document she produced to Ms. Sullivan.

### *Ms. And Mr. Thomas Wrongfully Profited And Enriched Themselves By Taking Money From Mr. Paulson's Account Without Authorization*

23.     It is far from certain that Mr. Paulson ever knowingly authorized Ms. Thomas to
be an owner of his account, *even* for the purpose of helping him pay *his* bills. In any event, Ms.
Thomas did not use her access to Mr. Paulson's bank account to manage his finances, as she
claimed she was authorized to do. Instead, it is clear from a review of the records that she
proceeded to use Mr. Paulson's bank account as her own personal checkbook. Indeed, the
spending practices on the account changed drastically after Ms. Thomas's addition to the account
in January 2020. Between January 2020 and March 2021, Ms. Thomas stole or spent
approximately $90,000 of Mr. Paulson's money for her own personal gain, through a mix of
debit card transactions, ATM withdrawals, automatic debit transactions, and internet payments.
Upon information and belief, Ms. Thomas also used her knowledge of Mr. Paulson's
account/routing number from his checks to direct automatic debit transactions to pay her bills
prior to the time she was formally added to the account.

24.     One day after she was added as an owner of Mr. Paulson's account, Ms. Thomas
withdrew $30,000 from the account. Mr. Paulson did not authorize Ms. Thomas to withdraw
that money. The timing of this withdrawal—so close to her ownership of the account—is
consistent with fraud, deceit, and exploitation, and entirely inconsistent with being a bookkeeper
or helping Mr. Paulson to pay his own bills. None of Mr. Paulson's expenses as listed in the
document Ms. Thomas produced necessitated anything approaching a one-time lumpsum
withdrawal of $30,000.

25.     Ms. Thomas does not claim otherwise.  Rather, in a conversation with Ms.

Sullivan, Ms. Thomas claimed that the $30,000 was a "gift" from Mr. Paulson to be used to

purchase, or make a down payment, on land.  Mr. Paulson never made a gift to Ms. Thomas of

$30,000 or authorized her to withdraw that money from his account.  Such a gift would be

completely out of the pattern and practice of Mr. Paulson's spending—he has never even given

his daughters a gift of that magnitude.  The gifts he has made to them over the years were of

nominal amounts on birthdays and at Christmas.  There is no other single debit or withdrawal

transaction from his bank account during this time period even approaching that amount.  And, if

Mr. Paulson had actually wanted to give a gift of any amount of money to Ms. Thomas, he could

have done so without adding her to his account.  The addition of Ms. Thomas, followed by the

withdrawal of a huge sum shortly thereafter, is evidence that she became an owner as part of a

maneuver to gain access to funds she could not otherwise tap into.

26.     Ms. Thomas's explanation for why Mr. Paulson made the alleged $30,000 "gift"

is also uncredible.  According to Ms. Thomas, Mr. Paulson knew there was a property for sale on

which Ms. Thomas could open her farm stand, and he thought that she "shouldn't pass it up."

Upon information and belief, Ms. Thomas used some or all of the $30,000 that she stole from

Mr. Paulson to buy a property at 26 Wheeler Camp Road in Perkinsville, Vermont.  Public

records show that Mr. and Ms. Thomas are co-owners of that property and that she purchased it

on February 11, 2020.  But records on Redfin.com show that property sold for only $20,000.  If

Mr. Paulson was supposedly giving Ms. Thomas a gift to help her buy the property, why was the

gift greater than the purchase price and/or down payment for the property?  Ms. Thomas's

explanation is implausible.

11

27.     In addition to this $30,000 withdrawal, Mr. Paulson's bank records from January 2020 to March 2021 reveal that Ms. Thomas stole more than $60,000 of Mr. Paulson's money to pay her and her husband's own bills and expenses throughout the year. For example, when Mr. Paulson was hospitalized for a week in January 2021, as discussed above in paragraph 14, Ms. and Mr. Thomas had their way with his money. From January 7-11, 2021, there were non-check withdrawals totaling roughly $1,088.70; those debits went to Walmart, Citgo Jiffy Mart, United Ag&Turg (an outlet that sold John Deere tractors and other power equipment), and the Claremont Irving convenience store. At the John Deere store, the Thomases spent more than $350. Owing to their spending binge during Mr. Paulson's January 2021 hospital stay, Mr. Paulson's overdraft protection kicked in on January 11, 2021, and, on January 12, $1800 was transferred – in two separate transactions – from his savings account to his checking account, on information and belief, by Ms. Thomas or Mr. Thomas. After replenishing Mr. Paulson's checking account, they promptly resumed spending on themselves while he remained hospitalized, including placing a "SEZZLE" order on January 13, 2021. SEZZLE's website offers "shop by category" for all kinds of products, such as "electronics, beauty, home, and footware," with interest free payments. Clearly, the hospitalized Mr. Paulson did not make those transactions, let alone authorize them. They had nothing to do with his finances.

28.     A review of the account transactions for February 2021 provides another useful example of the scale and pattern of Ms. and Mr. Thomas's theft during this time.  The February 2021 transactions associated with Ms. Thomas's debit card for the account are as follows:

| Transaction Date | Merchant Name | Amount |
|---|---|---|
| 2/2/2021 5:11 | 'VERMONT DMV SERV' | $ 140.00 |
| 2/5/2021 2:16 | 'SUBURBAN PROPANE' | $ 280.57 |
| 2/5/2021 17:13 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/6/2021 0:48 | 'CLAREMONT CITGO ' | $ 25.00 |
| 2/6/2021 13:15 | 'EXXON MAIN ST SE' | $ 69.90 |
| 2/6/2021 14:31 | 'WAL-MART #1975 ' | $ 184.40 |
| 2/6/2021 20:47 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/6/2021 20:58 | 'CLAREMONT CITGO ' | $ 1.00 |
| 2/6/2021 23:48 | 'EXXONMOBIL   97' | $ 69.90 |
| 2/12/2021 9:52 | 'EXXONMOBIL   97' | $ 34.95 |
| 2/12/2021 16:37 | 'WAL-MART #1975 ' | $ 496.45 |
| 2/14/2021 15:18 | 'DUNKIN CARD VERI' | $ - |
| 2/15/2021 12:30 | 'DUNKIN' AUTO REL' | $ 50.00 |
| 2/16/2021 2:01 | 'FLOWER POWER FUN' | $ 191.49 |
| 2/17/2021 8:26 | 'CITGO JIFFY MART' | $ 8.98 |
| 2/17/2021 17:41 | 'ASCUTNEY MARKET ' | $ 21.34 |
| 2/18/2021 19:24 | 'CLAREMONT SB    ' | $ 200.00 |
| 2/19/2021 9:29 | 'Wal-Mart Super C' | $ 274.13 |
| 2/19/2021 9:38 | 'CLAREMONT IRVING' | $ 1.00 |
| 2/19/2021 9:45 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/19/2021 10:01 | 'CLAREMONT IRVING' | $ 30.50 |
| 2/20/2021 14:50 | 'Wal-Mart Super C' | $ 161.82 |
| 2/20/2021 20:50 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/21/2021 11:11 | 'USCC IVR        ' | $ 102.81 |
| 2/21/2021 19:45 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/22/2021 2:14 | 'USCC IVR        ' | $ 102.81 |
| 2/22/2021 7:00 | 'CLAREMONT SB    ' | $ 500.00 |
| 2/26/2021 22:05 | 'DTV*DIRECTV SERV' | $ 112.00 |

Almost none of these charges reflect payment for the expenses that Ms. Thomas was allegedly paying for Mr. Paulson, as described in paragraph 22 above.  To the contrary, many of these charges are inconsistent with Mr. Paulson's pre-January 2020 spending practices.  The bulk of the charges plainly reflect that Ms. Thomas was using her access to Mr. Paulson's account to buy things for herself or her husband such as "Flower Power Fun."  For example, this statement reflects a payment to Suburban Propane, but Mr. Paulson has never had an account with Suburban Propane.  There are also almost $1,000 of charges at Walmart.  Upon information and

belief, the majority of these charges were not related to purchases for Mr. Paulson. Indeed, that

amount is clearly excessive to cover the basic needs of an 82-year old man. Even if all of the

Walmart charges reflect groceries for Mr. Paulson, the total for his groceries for the *entire month*

should have been less than $700, according to Ms. Thomas. Furthermore, Mr. Paulson was in

the hospital from February 18, 2021 through March 17, 2021, so he could not have authorized or

made any of the purchases during that time; and his needs and expenditures for the month should

have been far lower than in an ordinary month in which he was not hospitalized.

      29.     Ms. Thomas also withdrew $3,200 in cash during February 2021 (see entries for

"CLAREMONT SB"). Mr. Paulson did not have bills paid in cash totaling anywhere close to

that amount, and some of the cash withdrawals were made while he was hospitalized.

      30.     The automatic debit ("ACH") transactions from February 2021 also show theft by

Ms. Thomas. A list of those transactions is found below:

| RECEIVERCUSTNAME | AMT | POSTDATE | COMPANYNAME |
|---|---|---|---|
| Barbara A Thomas | $ 231.00 | 12-FEB-21 | ACADIA PAY |
| THOMAS,BARBARA | $ 139.94 | 17-FEB-21 | BK OF AMER VISA |
| BARBARA THOMAS | $ 101.86 | 18-FEB-21 | CAPITAL ONE |
| BARBARA A THOMAS | $ 690.00 | 08-FEB-21 | CHASE CREDIT CRD |
| BARBARA A THOMAS | $ 304.31 | 17-FEB-21 | CHASE CREDIT CRD |
| BARBARA A THOMAS | $ 153.51 | 22-FEB-21 | CHASE CREDIT CRD |
| BARBARA A THOMAS | $ 173.27 | 23-FEB-21 | CHASE CREDIT CRD |
| BARRY *PAULSON | $ 139.77 | 08-FEB-21 | COMCAST |
| BARRY PAULSON | $ 44.50 | 17-FEB-21 | DeCamp Trucking |
| BARBARA THOMAS | $ 28.63 | 04-FEB-21 | GrMtnPower |
| BARBARA THOMAS | $ 108.12 | 04-FEB-21 | GrMtnPower |
| BARBARA A THOMAS | $ 400.00 | 08-FEB-21 | HOME DEPOT |
| BARBARA A THOMAS | $ 670.96 | 24-FEB-21 | HOME DEPOT |
| BARRY E PAULSON | $ 1,505.00 | 03-FEB-21 | SSA TREAS 310 |
| THOMASMIKE | $ 292.32 | 23-FEB-21 | Suburban Propane |
| PAULSON    BARR | $ 20.00 | 16-FEB-21 | VT MEDICAID PREM |

This statement shows payments for a Bank of America Visa, a Chase credit card, and a Home

Depot credit card. All of these accounts are associated with Barbara Thomas. Mr. Paulson's

credit report reflects that he did not have a credit card with either of those banks or Home

Depot—in fact, he did not have any credit cards in his name. Moreover, there is nothing that

Ms. Thomas could have purchased for Mr. Paulson at Home Depot that matches the alleged bills

14

she was paying for him, as described in paragraph 22 above. This statement also shows a payment to "Suburban Propane," which is associated with the customer name "THOMASMIKE". As explained above, Mr. Paulson has never had an account with Suburban Propane. The automatic debit transactions also show two payments to Green Mountain Power. Moreover, the bank statement shows Mr. Thomas made a *third* payment to GMP that month: a check for $245.39. Upon information and belief, one or more of the payments to GMP made from Mr. Paulson's account were to cover GMP expenses for the Thomases.

31.     As can be seen from a review of the statements, Ms. and Mr. Thomas stole or misused more than $6,500 of Mr. Paulson's money in February 2021 alone. The bank statements for other months show a similar magnitude of theft by Ms. and Mr. Thomas.

32.     In addition to the spending at various retailers and on credit cards, from January 2020 to March 2021, Ms. Thomas withdrew more than $25,000 in cash from ATMs. Nearly all of these cash withdrawals were for the maximum daily withdrawal amount: $500. Upon information and belief, only a very small fraction of this cash (<$1000) was actually used to pay bills for Mr. Paulson and the rest of the cash was pocketed by Mr. and Ms. Thomas. Indeed, when Ms. Sullivan noticed the inexplicable ATM activity and confronted Ms. Thomas about it, Ms. Thomas said the cash was used to pay Mr. Paulson's bills—but, when asked specifically what bills, she named only Suburban Propane and a snowplowing bill. As explained above, Mr. Paulson did not have an account with Suburban Propane. In any event, even assuming Ms. Thomas paid for propane and snowplowing on behalf of Mr. Paulson with cash, those expenses could not have amounted to anything close to $25,000.

33.     Perhaps most egregious are two $490 charges for "LOVE VACATIONS" in December 2020—during the height of the COVID-19 pandemic and at a time of travel

restriction. LoveVacations is a travel website that offers lodging and other travel experiences. Needless to say, Mr. Paulson, who was immobile, blind, and very vulnerable to COVID-19, did not go on any vacations in December 2020, or in any time since, nor did he seek to take any such vacations. And he did not authorize Ms. Thomas—his self-professed bookkeeper—to use his money to book a romantic vacation for herself and, upon information and belief, her husband.

34.     In sum, Ms. Thomas was an owner of the account for a total of 15 months: from January 2020 through March 2021. Over the course of that time, a total of **$104,359.86** was spent from the account. According to the expenses table *provided by Ms. Thomas*, Mr. Paulson's expenses over that time should have amounted to only $34,963.75. Moreover, Mr. Paulson received social security payments totaling $22,320 over that time, which are documented as deposits in his bank records. Accordingly, Mr. Paulson's net expenses over that time amounted to only **$12,643.75**. Upon information and belief, the additional **$91,716.11** that was spent or stolen from his account during that time was taken by the Thomases for their own personal use.

## COUNT ONE: FINANCIAL EXPLOITATION OF A VULNERABLE ADULT (pursuant to 33 V.S.A. § 6952)

35.     The allegations set forth in the preceding paragraphs are incorporated herein as if set forth in full.

36.     At all times relevant to this action, Mr. Paulson was a vulnerable adult because he was impaired due to the infirmities of aging and physical disability such that he could not provide for his own care without assistance and was unable to protect himself from abuse, neglect, or exploitation.

37.     Mr. and Ms. Thomas knowingly or recklessly exploited Mr. Paulson's vulnerabilities to gain access to his bank account and steal approximately $90,000 of his money. Mr. and Ms. Thomas knowingly or with reckless disregard used or disposed of the funds of Mr.

16

Paulson, a vulnerable adult, without or in excess of legal authority for their own wrongful profit or advantage. Mr. and Ms. Thomas knowingly or with reckless disregard acquired possession or control of or an interest in funds or property of Mr. Paulson through the use of undue influence, harassment, duress, or fraud.

38.    As a direct and proximate result of Mr. and Ms. Thomas's exploitation,

Mr. Paulson has been damaged in an amount to be proven at trial.

## REQUESTS FOR RELIEF

Wherefore, Plaintiffs Barry Paulson, Kim Paulson, and Michelle Sullivan request that the Court:

A.  Enter judgment in its favor on all Counts; and

B.  Award compensatory and punitive damages; and

C.  Award reasonable attorneys' fees, costs, and interest; and

D.  Grant such other and further relief as the Court considers just and appropriate.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

DATED at Burlington, Vermont, this 10th day of August 2021.

**BARRY PAULSON, KIM PAULSON, AND MICHELLE SULLIVAN**

By: *Christina E. Nolan* /hcw

Christina E. Nolan, Esq.
Hannah C. Waite, Esq.*
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, 6th Floor
P.O. Box 66
Burlington, Vermont 05402-0066
(802) 864-9891
cenolan@sheeheyvt.com
hwaite@sheeheyvt.com

*Motion for Pro Hac Vice Admission
Filed Herewith*

17

## VERIFICATION

I, Kim Paulson, state under pains and penalties of perjury that: I am a plaintiff in this action and I have read the foregoing Verified Complaint and state that the allegations are true and accurate, to the best of my belief and knowledge.

Dated: August 10, 2021

Kim Paulson
Kim Paulson

## VERIFICATION

I, Michelle Sullivan, state under pains and penalties of perjury that: I am a plaintiff in this action and I have read the foregoing Verified Complaint and state that the allegations are true and accurate, to the best of my belief and knowledge.

Dated: August 10, 2021

Michelle Sullivan
Michelle Sullivan

18